WILLARD R. and MARTHA G. BAKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baker v. Commissioner
Docket No. 29970-89
United States Tax Court
T.C. Memo 1991-331; 1991 Tax Ct. Memo LEXIS 382; 62 T.C.M. (CCH) 175; T.C.M. (RIA) 91331; July 22, 1991, Filed *382 Decisions will be entered for the petitioners. Brenda K. Leighton, William B. Steele III, and J. J. French, Jr, for the petitioners. James F. Prothro, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1977
$   144,119
1978
58,429
1979
103,099
1980
1,140,113
The issues for decision are: (1) Whether promissory notes executed by petitioner Willard R. Baker as payor are excluded from his basis in certain partnership interests because they are too contingent an obligation to be treated as genuine debt for tax purposes; and (2) Whether promissory notes executed by petitioner Willard R. Baker as payor are excluded from his basis in certain partnership interests as sham transactions because they were executed solely for tax purposes. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Dallas, Texas, when they filed their petition. From 1965 through 1977, petitioner (all references to petitioner *383 are to Willard R. Baker) and Trammell Crow (Crow) were partners in 30 real estate development partnerships (the partnerships). Crow is a Texas-based developer of major real estate projects throughout the world. Petitioner held varying interests in the partnerships, but never more than a 50-percent interest, and, generally, 25 percent or less. During the early years of their business relationship, petitioner and Crow, through various partnerships, developed apartment buildings to hold for long-term ownership. They later concentrated on land development. Crow was considered the "financial partner," having the financial resources to invest capital in the projects, as well as the business influence to readily obtain financing. Both petitioner and Crow generally were personally liable for financed amounts. Petitioner's responsibilities as a partner were market research, site acquisition, preliminary layout, leasing out the completed project, and continuing management. The Baker-Crow Company, the stock of which petitioner owned 33 percent and Crow owned 66 percent, performed all administrative services for the partnerships. The Baker-Crow Construction Company, owned in the same *384 proportions by petitioner and Crow, served as general contractor for the partnerships. Through 1974, the real estate market in the southeastern United States offered tremendous opportunities. From 1974 through 1978, the real estate market in Texas suffered a dramatic recession. Due primarily to the recession, many of the partnerships experienced negative cash flows and could not pay their debts, ultimately resulting in a deficit in petitioner's partnership capital accounts. At the same time, petitioner was experiencing personal financial difficulties. Several of his creditors obtained judgments against him. Due in part to the financial difficulties suffered by the partnerships and by petitioner during this period, the business and personal relationship between petitioner and Crow deteriorated. The Crow organization explored various methods through which to remove petitioner from the partnerships and to collect as much of his capital account deficit as possible. Petitioner was asked by the Crow organization to move out of his office and forbidden access to any partnership documents or records. On April 1, 1975, the Baker-Crow Company issued promissory notes (the Baker-Crow *385 notes) exceeding the aggregate of $ 20,000,000 to several of the partnerships. These loans represented amounts that had been advanced to the partnerships by Crow through the Baker-Crow Company to cover the negative cash flow of partnership properties. Petitioner was personally liable for his share of the amounts advanced to the partnerships. Each of the Baker-Crow notes was assigned to Crow by the Baker-Crow Company on April 1, 1975. Petitioner granted Crow a security interest in petitioner's interests in the partnerships to secure the indebtedness of the Baker-Crow Company to Crow. On April 1, 1975, petitioner and Crow entered into a Security Agreement and Collateral Assignment of Partnership Interest with respect to petitioner's interest in each of the partnerships. Petitioner also entered into three other security agreements in which he assigned his interests in the Baker-Crow Company, the Baker-Crow Construction Company, and the Baker-Crow No. Three Company to Crow as further security for the indebtedness of the Baker-Crow Company to Crow. Petitioner signed the security agreements at the request of Crow. As an inducement for petitioner to execute the documents, petitioner *386 and Crow entered into an informal agreement (the informal agreement) on April 15, 1975, regarding their future business relationship. The informal agreement provided, in relevant part: (1) That one of the Baker-Crow entities would guarantee two of petitioner's personal obligations, if a guarantee was necessary; (2) that Crow would assist petitioner in meeting additional personal obligations; (3) that petitioner would sell his farm and ranch, applying the net equity to the satisfaction of his personal debts; (4) that petitioner would receive a salary of $ 60,000 per year from the Baker-Crow Company and would have the right to draw up to $ 40,000 per year from new projects; (5) that Crow would have complete control over the properties held by the partnerships and would be entitled to sell or refinance the existing properties as he deemed appropriate; (6) that any new partnerships formed after April 15, 1975, would be on a 50/50 basis between petitioner and Crow; and (7) that petitioner would manage any future projects between petitioner and Crow. Although petitioner relinquished control of the existing partnership properties and attempted to sell his ranch and farm, Crow did not comply *387 with the terms of the informal agreement. Petitioner's creditors were not satisfied, petitioner did not receive the agreed upon salary, and an accounting, which was necessary to verify his right to a draw from new projects, was never provided to petitioner. The business and personal relationship between petitioner and Crow continued to deteriorate during 1976. Crow was concerned with maintaining control over the partnership properties, with petitioner's ability to satisfy his personal creditors, and with the potential negative impact on the partnerships if petitioner filed for bankruptcy. Petitioner, on the other hand, felt he had been abandoned by Crow. On March 1, 1976, a charging order writ was issued against petitioner's interest in certain of the partnerships in favor of five of petitioner's personal creditors that had obtained judgments against him. In addition, a temporary restraining order was issued with respect to the sale, transfer, or encumbrance of the assets of certain partnerships. A copy of the charging order writ and temporary restraining order was served on the Crow organization. These orders clouded the ability of the partnerships to make distributions and *388 to restructure their debts. On December 14, 1976, Crow demanded that payment be made under the $ 20,000,000 note executed by the Baker-Crow Company. Crow notified petitioner that unless payment was made on the note within 10 days, Crow would foreclose at a sale to be conducted on December 29, 1976, on those of petitioner's partnership interests which were subject to security agreements. Petitioner responded to this demand by requesting an accounting with respect to the partnerships. The accounting was never provided to petitioner, and the foreclosure sale was not conducted. Shortly thereafter petitioner's attorney, Ray Campbell, initiated negotiations with Crow and his attorneys with respect to the termination of the business relationship between petitioner and Crow. The negotiations continued through the summer of 1977. Crow was represented during negotiations by Terry Golden (Golden), the managing partner of the Trammell Crow Residential Companies from 1976 through 1984. Golden's primary function was to perform "work-outs," which involved refinancing projects with negative cash flows and disposing of properties with poor profit potential. With respect to projects involving *389 petitioner, Golden's goal was to eliminate petitioner's interests in the projects while recovering as much of the accrued losses as possible from petitioner. Petitioner's goals were to have Crow satisfy his personal creditors and to be relieved of all of the partnership liabilities for which he was personally liable. Golden participated in negotiation conferences with petitioner and petitioner's attorney, Ray Campbell. The negotiations on behalf of petitioner and Crow were extensive, hard-nosed, and volatile. Petitioner and Crow ultimately agreed to a foreclosure sale as a means by which their business relationship would be terminated. In consideration of petitioner's consent to the foreclosure, Crow agreed that he would assume petitioner's obligations under the partnerships and satisfy certain of petitioner's personal debts. However, Crow insisted, over the objections of petitioner and his attorney, that petitioner execute promissory notes payable to Crow in the total amount of $ 4,303,293 (the notes). Such amount was represented by Crow to petitioner, who had not obtained an accounting of the partnerships, to be his net deficit capital account balance. Because Crow had not *390 provided an accounting, petitioner's attorney advised him not to sign the notes. However, because petitioner was unable to develop any projects until his personal creditors were satisfied, and because the real estate market was quickly recovering, petitioner signed the notes against the advice of his attorney in order to avoid any further delays. The foreclosure proceedings were commenced on August 16, 1977. Pursuant to the foreclosure sale, on August 17, 1977, petitioner and Brighton Development Corporation (Brighton), a corporation controlled by Crow, entered into an agreement for the sale, purchase, and transfer of petitioner's interests in the partnerships, certain corporate stock, and other properties (the sale agreement). The negative balance in petitioner's partnership capital accounts at the time of the sale to Brighton was actually $ 4,798,476, resulting in a realized gain to petitioner of $ 495,163 on the exchange. Pursuant to the agreement of sale, petitioner executed a note payable to Brighton in the principal amount of $ 1,332,590 on August 17, 1977. The note represented petitioner's deficit account balance in three of the partnerships. Petitioner's interests in *391 those three partnerships were transferred to Brighton prior to the closing to be held with respect to the remaining partnership interests. At the closing on September 6, 1977, an Assignment of Seller's Interests was executed by petitioner and on behalf of Brighton. On that date, petitioner executed a promissory note payable to Brighton in the principal amount of $ 2,970,703. This second note represented Crow's assessment of petitioner's net deficit capital account balance in the remaining partnerships. Both notes (hereinafter referred to as the promissory notes) provided for monthly payments of interest at 8 percent per annum beginning February 1, 1978, and for payment of the principal on or before June 30, 1987. The promissory notes were unsecured and non-negotiable. The promissory notes were a negotiated part of the exchange and represented valid and enforceable obligations of petitioner to Brighton. Both petitioner and Crow expected the notes to be paid by petitioner and there was no agreement or understanding that the notes would later be cancelled. The tax consequences of executing the promissory notes as part of the consideration to Crow were not a subject of negotiation *392 between the representatives of petitioner and the representatives of Crow. Because his earning capacity was sharply limited by the judgments his creditors held, the tax consequences of the transaction were secondary to petitioner. Shortly prior to the due date of the first interest payments on the notes, February 1, 1978, petitioner received a telephone call from a representative of Crow reminding him of the coming payment. Petitioner contacted his attorney and advised him that he intended to make the payment. At that time petitioner was capable of making a partial payment on the interest payable. Campbell advised petitioner not to make the payment, and thereafter notified Golden that the payment would not be made. Golden responded vehemently to Campbell's announcement and threatened to obtain a judgment against petitioner on the notes. Campbell then threatened a countersuit against Crow. The bases of Campbell's threatened countersuit were: (1) Breach of fiduciary duty (Crow breached his fiduciary obligation to provide petitioner with an accounting of the partnerships), (2) fraud in the inducement (Crow prevented petitioner during negotiations from obtaining necessary information *393 of the true value of his interests in the partnerships), and (3) lack of consideration (based on the theory that a proper accounting would show that petitioner had no capital account deficit). After negotiations, which commenced in February of 1978 and ended in April of 1978, Golden agreed to cancel the notes in exchange for a general release of any claims petitioner had against Crow. The notes were assigned by Brighton to Crow on April 26, 1978. On April 27, 1978, petitioner and Crow entered into a debt cancellation and general release. Petitioner reported the gain realized on the exchange of $ 495,163 on his Federal income tax return for 1977. For taxable year 1977, petitioner had net operating loss carryovers of $ 3,184,749 which could not be carried over to taxable year 1978. Other than the gain on the exchange, petitioner had no substantial income to offset against the net operating loss carryovers. OPINION As a preliminary matter, we address respondent's allegation, first raised at trial after the presentation of petitioner's case, that petitioner had income from the cancellation of debt in 1978. The deficiency determined by respondent in his notice of deficiency for *394 1978 is due to the disallowance of a net operating loss carryforward. In his notice of deficiency, respondent did not determine, and in his Answer he did not allege, that petitioner had income from the cancellation of the promissory notes in 1978. Rule 41(a) (Amendments) provides as follows: A party may amend a pleading once as a matter of course at any time before a responsive pleading is served. If the pleading is one to which no responsive pleading is permitted and the case has not been placed on a trial calendar, then a party may so amend it at any time within 30 days after it is served. Otherwise a party may amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires. No amendment shall be allowed after expiration of the time for filing the petition, however, which would involve conferring jurisdiction on the Court over a matter which otherwise would not come within its jurisdiction under the petition as then on file. A motion for leave to amend a pleading shall state the reasons for the amendment and shall be accompanied by the proposed amendment. The amendment to the pleading shall not *395 be incorporated into the motion but rather shall be separately set forth and consistent with the requirements of Rule 23 regarding form and style of papers filed with the Court. See Rules 36(a) and 37(a) for time for responding to amended pleadings.
Respondent failed to file an amendment to his Answer prior to trial alleging that petitioner had unreported income from the cancellation of the promissory notes in 1978. However, in his trial memorandum, respondent states that one of the primary issues in the instant case is "Whether there was cancellation of indebtedness income to Baker in 1977, and/or in 1978." Respondent states further that "The respondent contends that Baker received income from the cancellation of debt in 1978 when the notes were cancelled by Crow." At the opening of trial, petitioner stated, with respect to the issue of whether he realized cancellation of debt income in 1978, "That issue and that theory has not been raised in the statutory notice of deficiency or in the pleading, and we would like to object to that theory for an increased deficiency in 1978 being brought up at this time." The Court then asked respondent whether he was taking the position *396 that petitioner was liable for an increased deficiency in taxable year 1978, to which respondent replied, "No, your Honor." However, upon commencing the presentation of his case, respondent stated as follows: Your Honor, before I begin, I would like to make clear that on the subject that was brought up earlier, whether we would be seeking an increased deficiency in the year of the cancellation of the notes in question, that we will be seeking that as an alternative.
The Court replied that in order to do so, respondent must amend his Answer, and that the Answer could not be amended during trial because it would constitute a surprise and be unfair to petitioner. The Court then advised respondent that he was free to file a post-trial amendment to conform the pleadings to the evidence as provided under Rule 41(b). With respect to such an amendment, Rule 41(b) provides as follows: (1) Issues Tried by Consent: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The Court, upon motion of any party at any time, may allow such amendment of the pleadings *397 as may be necessary to cause them to conform to the evidence and to raise these issues, but failure to amend does not affect the result of the trial of these issues. (2) Other Evidence: If evidence is objected to at the trial on the ground that it is not within the issues raised by pleadings, then the Court may receive the evidence and at any time allow the pleadings to be amended to conform to the proof, and shall do so freely when justice so requires and the objecting party fails to satisfy the Court that the admission of such evidence would prejudice such party in maintaining such party's position on the merits. (3) Filing: The amendment or amended pleadings permitted under this paragraph (b) shall be filed with the Court at the trial or shall be filed with the Clerk at Washington, D.C., within such time as the Court may fix. [Fn. ref. omitted.]
With respect to Rule 41(b)(1), the issue of whether petitioner is liable for cancellation of indebtedness income was not tried by express or implied consent of the parties. In fact, petitioner expressly objected to the trial of such issue, and respondent initially indicated to the Court that he would not attempt to pursue *398 such issue. With respect to Rule 41(b)(2), petitioner has satisfied this Court that to allow the pleadings to be amended to conform to the proof would prejudice petitioner in maintaining his position on the merits. Respondent attempted to increase the deficiency for taxable year 1978 under a new theory only after petitioner had presented his case. To allow respondent to then amend his pleadings would deprive petitioner of the opportunity to adequately mount a defense against respondent's allegation. We therefore hold that whether petitioner realized income from the cancellation of indebtedness in taxable year 1978 is not at issue. Whether the Promissory Notes Are Too Contingent An Obligation To Be Treated As Debt
Petitioner argues that the promissory notes which he executed in favor of Brighton should provide additional basis in his partnership interests and thereby reduce the realized gain on the exchange. Respondent maintains that the promissory notes were highly speculative and contingent liabilities for which there was no reasonable likelihood that the lender would be repaid in light of all of the reasonably foreseeable risks, and therefore should not be treated as *399 genuine debt. Petitioner bears the burden of proving that the promissory notes constituted genuine debt for tax purposes. Rule 142(a); . The tax consequences of the execution of the promissory notes, if they are held to be genuine debt, are not at issue. This Court has previously held that when a transaction is structured in such a manner that payment by the taxpayer is not probable, either because of the length or the terms of the debt, the source of the payments, or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, then such debt is not genuine indebtedness. , affd. . However, we find Durkin v. Commissioner distinguishable from the instant case because Durkin involved nonrecourse loans with principal payable solely out of exploitation proceeds. The promissory notes executed by petitioner were not subject to any such contingencies; upon nonpayment of interest or principal, the debt could be reduced to judgment by Crow through Brighton. Thus, there *400 existed a substantial economic incentive for petitioner to pay the debt. Respondent relies primarily on . In Zappo, the taxpayers incorporated an enterprise to construct and sell townhouses. The corporation then issued additional stock representing a 50 percent ownership interest to a new group of investors. The taxpayers retained the remaining 50 percent interest. When the additional stock was issued, the new investors loaned certain amounts to the taxpayers and to a second corporation controlled by the taxpayers. The taxpayers personally guaranteed the loan to the second corporation and also pledged their stock in the first corporation as security for both loans. The business relationship between the taxpayers and the new investors deteriorated and the new investors asserted their rights to sell the taxpayer's pledged stock in the first corporation. However, a settlement was reached in which the taxpayers transferred their shares of the first corporation to the new investors and the new investors released the taxpayers from their obligations under the loans. In addition, the taxpayers executed an agreement *401 personally guaranteeing that the new investors would receive at least $ 53,500 under a pre-existing agreement with an unrelated entity. In Zappo, the taxpayers asserted that the agreement guaranteeing a return of $ 53,500 from the unrelated entity represented a refinancing of a portion of their obligations under the loans, and, therefore, that they realized no gain from the settlement. This Court found that the taxpayers' obligations under the guarantee agreement were too contingent on an uncertain future event, the satisfaction by the unrelated entity of its obligation under the pre-existing contract, to be genuine indebtedness which refinanced the taxpayers' liability under the initial loan agreements. . We find Zappo inapplicable to the instant case. In Zappo, the amount of the taxpayers' liability could not be determined until the end of a 5-year period, the liability was not interest bearing, and the taxpayers were entitled to a credit against the liability for funds paid by a third party. In comparison, petitioner's liability under the promissory notes was for a fixed, determinable amount, was due on *402 a fixed date, and bore interest at a stated rate. The promissory notes were not subject to a contingency such as that incorporated into the guarantee agreement in Zappo. The promissory notes were primary obligations of petitioner which were in no way contingent or speculative. Respondent also cites to a line of cases holding that a note or obligation will not be treated as a debt for tax purposes when it is highly unlikely, or impossible, to estimate whether and when the debt will be repaid. , affd. in part and revd. in part ; , vacated and remanded on other issue ; ; , affd. ; ; , affd. . , *403 , and , all concern limited partnership drilling ventures that purchased participation in oil and gas leaseholds. The partnerships then contracted with the driller-operator of the leaseholds to drill exploratory wells. The partnerships paid 40 percent of the drilling costs in cash and executed nonrecourse promissory notes for the remaining 60 percent. Although the notes were secured by the leaseholds, repayment would occur only if oil were produced from the wells. Thus, payment of the notes was contingent on the occurrence of future events. Petitioner's liability on the promissory notes, however, was fixed and certain and contained absolutely no contingencies. We therefore find these cases distinguishable from the instant case. Likewise, , , and , are equally inapplicable inasmuch as each opinion involves an obligation payable only out of and to the extent of profits of an enterprise. Although petitioner *404 expected to earn money from real estate transactions in order to pay the promissory notes, his liability under such notes was in no way contingent on his real estate activities. Crow could have reduced the promissory notes to judgment regardless of the profitability of petitioner's real estate ventures. Finally, respondent argues that petitioner's financial condition at the time the promissory notes were executed rendered such notes speculative and contingent. However, petitioner's financial circumstances at the time of executing the promissory notes did not make the liability under such notes less than absolute. The financial condition of a taxpayer does not affect the treatment of debt for tax purposes until an event occurs that establishes with reasonable certainty that the debt will not be repaid. See . In any case, the testimony of petitioner and Crow established petitioner's capability and expertise in identifying and managing highly profitable real estate ventures. Both petitioner and Crow testified as to petitioner's probable capability of paying the principal amounts of the promissory notes when due. In *405 addition, as established by the testimony of petitioner, Campbell, and Golden, the promissory notes were structured so as to allow petitioner the opportunity to improve his financial condition prior to making any payments of principal on the promissory notes. Crow testified that, in his opinion, petitioner would be capable of making the payment of principal due 10 years from the execution of the promissory notes. In conclusion, we find that the promissory notes were neither too contingent nor too speculative to be treated as genuine debt for tax purposes, and hold that petitioner's basis in his partnership interests is increased by the principal amount of the promissory notes, thereby reducing the gain realized on the exchange. Whether Promissory Notes Are Sham Transactions Executed Solely For Tax Avoidance Purposes, And Therefore Will Not Be Given Effect
Respondent argues that the exchange of petitioner's partnership interests for the promissory notes took place solely for tax purposes and had no economic effect. Therefore, respondent argues, the promissory notes should be disregarded in computing the gain realized by petitioner on the transaction. In general, business *406 transactions are given effect consistent with the substance and form of the transactions. When analyzing the substance and form of business transactions the reality that the tax laws affect the shape of most business transactions cannot be ignored. . However, it is well established that a transaction entered into solely for the purpose of anticipated tax reduction and which has no economic objective to support it is a sham and without effect for Federal income tax purposes. When a transaction is properly determined to be a sham, the Commissioner is entitled to ignore the form applied by the parties and tax the transaction according to its substance. ; , affd. in part and revd. in part . The courts have, in appropriate circumstances, disregarded, for Federal income tax purposes, a variety of transactions entered into without any economic, commercial, or legal purpose other than the hoped for favorable tax consequences. Where *407 a taxpayer, cognizant of potential tax benefits, enters into a transaction of questionable economic worth, the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose and economic substance is present. . Examinations into the business purpose and economic substance of a transaction are inherently factual. ; , affd. in part, revd. in part sub nom. . The business purpose inquiry tends to be an inquiry of the taxpayer's subjective purpose for entering into the transaction at issue. ; . The economic substance inquiry tends to be an analysis of the objective factors indicating whether the transactions had a reasonable opportunity of producing a profit. ; . *408 Petitioner bears the burden of proving that the exchange was not a sham transaction. Rule 142(a); . We do not believe that the exchange before us represents a sham transaction. Petitioner has established that he had a business purpose for entering into the exchange. It was essential to petitioner that he satisfy his personal creditors in order to continue in the real estate development business. Because of the personal judgments outstanding against him, petitioner was unable to obtain financing either for personal purposes or for the various development opportunities which arose as the real estate market improved. In addition, his relationship with Crow had grown unworkable, and it was necessary for petitioner to disassociate himself from the partnerships. Finally, respondent has failed to introduce any testimony or documentary evidence controverting the testimony of the witnesses who testified in favor of petitioner, including respondent's attorney, Campbell, the managing partner of the Trammell Crow Residential Companies, Golden, Crow's attorney, Boe Martin, and Crow himself. We find entirely credible the testimony *409 of petitioner and his attorney that petitioner was extremely reluctant to execute the promissory notes and that he did so only after it became clear that to do so was the only way to conclude the lengthy negotiations with the Crow organization and allow petitioner to take advantage of several profitable development opportunities. While respondent argues that, after the exchange, petitioner's debt to Crow exceeded the judgments for which he had previously been liable, and that therefore there was no business purpose for the exchange, we accept petitioner's explanation that it is preferable to be subject to a debt, the principal of which is not due for 10 years, than to be liable for several debts which have been reduced to judgment. We also accept the testimony of the witnesses from the Crow organization that the promissory notes were structured so as to allow petitioner to commence profitable operations as quickly as possible, and thus repay his debt to Crow. We also conclude that the exchange had economic substance, and should therefore be recognized for Federal income tax purposes. We reject respondent's contention that, at the time the promissory notes were executed, the parties *410 to the exchange anticipated the cancellation of the notes. Golden (a former Assistant Secretary of the Treasury and Administrator of the General Services Administration) testified that his motive in conducting the negotiations was to recover as much as possible from petitioner. Boe Martin, a distinguished attorney of 25 years experience who represented Crow in the negotiations, testified that he drafted the agreements involved in the exchange and that there was of understanding the promissory notes would not be honored. Campbell, petitioner's attorney, testified that throughout the negotiations Crow attempted to "get every dime" out of petitioner and that there was no understanding the promissory notes would not be honored. Campbell also testified that he advised petitioner not to execute the promissory notes, not to make the first interest payment, and thereafter negotiated the cancellation of the notes with Golden. Finally, Crow himself testified he expected petitioner would be capable of repaying the debt represented by the promissory notes, and that there was no sham transaction. Respondent failed to produce any witnesses or documentary evidence to controvert the testimony *411 of these witnesses. Finally, respondent has failed to explain how the structure of the exchange resulted in a tax advantage to petitioner. As respondent established at trial, petitioner was entitled to a net operating loss carryover in the amount of $ 3,184,749 for taxable year 1977 which could not be carried over into taxable year 1978. Therefore, there existed an incentive for petitioner to recognize gain on the exchange in taxable year 1977, rather than taxable year 1978. We do not believe that the deferral of the tax liability resulting from the exchange into taxable year 1978, as respondent alleges was petitioner's intent, is sufficient motivation to lead him to forsake the net operating loss carryover available in taxable year 1977. Both parties to the transaction had a reasonable opportunity of producing a profit. Petitioner produced a profit through the satisfaction of his judgment creditors, which enabled him to participate in several profitable development ventures. Crow profited through the elimination of petitioner's partnership interests, and, at least initially, through petitioner's debt to Crow. Based on the uncontroverted testimony of all of the witnesses at *412 trial we hold that the exchange was not a sham transaction.